IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MARY ANN TORP and | ) | |
| GEORGE TORP, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-1042-CV-W-HFS |
| | ) | |
| GENERAL MOTORS ACCEPTANCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Defendant, General Motors Acceptance Corporation "GMAC," has filed a motion for summary judgment. GMAC claims that summary judgment is appropriate due to the lack of privity between itself and plaintiffs; its lack of duty to plaintiffs. GMAC also claims that the lack of communication between itself and plaintiffs regarding the sale of the vehicle demonstrates that any alleged negligence on its part was not the proximate cause of any injuries asserted by plaintiffs. Plaintiffs, Mary Ann and George Torp, commenced this action against GMAC in state court and asserted claims alleging a violation of the Missouri Merchandising Practices Act; negligence; negligent misrepresentation; and fraud. On October 26, 2005, GMAC removed the action to this court, pursuant to 28 U.S.C. §§ 1332 and 1441 et seq.

## Background Facts[1]

The crux of plaintiffs' claims revolve around their purchase of a 1999 Cadillac El Dorado. According to the complaint, GMAC purchased the vehicle new from Williams Cadillac located in Birmingham, Alabama, and then leased it to Brack Williams[2] from October of 1998 through October of 2001. (Complaint: ¶5). Business records from State Farm Mutual Insurance Company indicate that on June 21, 2001, while the vehicle was leased by Mr. Williams, it was involved in a front-end collision with another vehicle and sustained $6000.00 worth of damage. (GMAC SUMF: ¶ 2). At the expiration of the lease, Mr. Williams filled out a SmartLease/SmartBuy Condition Report, but failed to indicate the accident event. (Id: ¶¶ 5-8).

GMAC placed the vehicle on its SmartAuction website, available only to registered automobile dealers authorized to participate in the SmartAuction program. (Id: ¶¶ 9-11). On October 15, 2001, Westfall O'Dell Motors dealership located in Excelsior Springs, Missouri placed a winning bid, and purchased the vehicle. (Id: ¶ 17). Westfall then inspected and certified the vehicle, and advertised it for sale. (Id: ¶¶ 18-19). On December 3, 2001, plaintiffs purchased the vehicle from Gene Proffitt, a sales representative at Westfall, and financed the purchase through GMAC. (Id: ¶¶ 24-25). The purchase price was $28,900, and the mileage was 28,865 miles. In January of 2003, plaintiffs attempted to determine the trade-in value of the vehicle, and discovered, through a CarFax Report, that the vehicle was involved in an accident on June 21, 2001 while leased by Mr. Williams. (Id: ¶ 26).

Upon learning of this, plaintiffs attempted to return the vehicle to Westfall dealership and obtain the return of the purchase price, i.e. $28,900. (Id: ¶ 29). Initially, Westfall refused these requests, and plaintiffs filed suit alleging fraud and negligence. (Id). The parties eventually entered into a settlement agreement whereby

---

[1] For the most part, are taken from GMAC's Statement of Uncontroverted Material Facts "SUMF," but where disputed by plaintiffs, will be duly noted.

[2] No familial relationship with the Williams Cadillac dealership.

2

plaintiffs received $47,500, and retained ownership of the vehicle. (Id: ¶¶ 30-31). Plaintiffs continued to drive the vehicle until it was declared a total loss after Mrs. Torp drove it into a light pole. (Id: ¶ 31). However, prior to this accident, and as noted above, plaintiffs filed suit against GMAC.

## **Standard of Review for Summary Judgment**

Summary judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a jury in weighing the evidence, and in rendering credibility determinations. Evans v. Rudy-Luther Toyota, Inc., 39 F.Supp.2d 1177, 1180 (D.Minn. 1999); citing, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary judgment is appropriate when we have reviewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and we have found no triable issue. Id., at 1180-81. A disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id., at 1181; citing, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. Id., at 1181. In sustaining that burden, an adverse party may not rest upon mere allegations or denials, but must respond by affidavit, or otherwise provided, set forth specific facts showing that there is a genuine issue for trial. Id.; quoting, Fed.R.Civ.P. 56(e); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Summary judgment is appropriate where the nonmoving party has failed "to establish the existence of an element essential to [its] case, and on which [they] will bear the burden of proof at trial." Id.; citing, Celotex Corp. v. Catrett, 477 U.S. at 322.

3

**Analysis**

A.     Missouri Merchandising Practices Act

The Missouri Merchandising Practices Act "MPA" was created to supplement the definition of common-law fraud. Clement v. St. Charles Nissan, Inc., 103 S.W.3d 898, 899 (Mo.App.E.D. 2003). It attempts to preserve fundamental honesty, fair play, and right dealings in public transactions. Id., at 899. It provides, in relevant part, that, "The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... in or from the state of Missouri, is declared to be an unlawful practice." Id., at 899-900; quoting, Section 407.020.1. Once a violation is determined to have occurred, or is about to occur, irreparable harm and harm to the public are presumed. Id., at 900.

In count I of the complaint, plaintiffs allege that GMAC failed to disclose the 2001 accident and resulting damage, and misrepresented the accident and damage to the vehicle in violation of the Missouri Merchandising Practices Act § 407.020 RSMo ("MPA"). GMAC argues that this argument fails because it made no representations to plaintiffs and did not sell the vehicle to them; therefore, there is no privity of contract.

In support of their respective arguments, both parties rely, in large measure, on the Gibbons case. GMAC relies on the initial Gibbons decision which dismissed the petition of the used car buyer against the wholesaler. Gibbons v. J. Nuckolls, Inc., 2006 WL 2008372 (Mo.App. E.D.). The court found that the used car buyer, who purchased a car from an automobile dealer, had no privity of contract with the third-party automobile wholesaler who sold the car to the dealer. Id., at *2. The Gibbons court reasoned that this finding was supported by the statutory language as well as prior caselaw - although the court noted that the used car buyer may have a claim for common law fraud against the wholesaler. Id.

4

On appeal, however, the Missouri Supreme Court found that the broad language of the MPA included those transactions between a consumer who received a product or services through a third party. Gibbons v. J. Nuckolls, Inc., 216 S.W.3d 667, 669 (Mo.Sup. 2007). GMAC contends that while the Attorney General has standing to investigate alleged violations of the MPA without a privity requirement, a private right of action granted pursuant to the MPA does not include wholesale transactions. Contrary to GMAC's contention, however, the Gibbons court expressly considered this argument, and found that to accord broader authority to the attorney general would place a significant limitation on Missouri consumers, and this it declined to do. Id., at 670. In reaching this decision, the court relied on relevant precedent which "consistently reinforces the plain language and spirit of the statute to further the ultimate objective of consumer protection, regardless of whether the suit is filed by the state or by an individual" Id., at 670 n. 13.

Thus, that part of GMAC's motion seeking summary judgment as to Count 1, alleging a violation of the MPA, is denied.

B.  Negligence

Plaintiffs claim that GMAC's failure to determine that the vehicle had previously been damaged constituted negligent conduct, because it was reasonably foreseeable that the failure to do so would cause damage to them. Once again, GMAC relies on the lack of privity to support its claim that since it had no duty to plaintiffs it was not liable for any negligent conduct. GMAC further notes, however, that it does not concede it acted negligently.

In order to prove negligence one must prove that the defendant had a duty, breached that duty, that the breach was the proximate cause of the plaintiff's damages and that the plaintiff actually incurred damages as a result. Bray v. Brooks, 41 S.W.3d 7, 15 (Mo.App. W.D. 2001). In order to prevail under a negligence claim, the claimant must prove every one of the four elements. Bray, at 15.

GMAC contends that plaintiffs' negligence claim fails because it did not owe a duty to plaintiffs to discover the previous damage to the vehicle. GMAC bases its argument on the undisputed fact that it did not communicate with plaintiffs prior to the sale or during the sale of the vehicle, and because all discussions and negotiations took place between plaintiffs and Westfall Motors. Consequently, there is no privity between plaintiffs and GMAC. GMAC also points to the undisputed fact that in its agreement with Westfall, it disclaimed all warranties, including those for merchantability and fitness for a particular purpose.

Alternatively, GMAC argues that even if it owed a duty to plaintiffs, and through the negligent inspection of the vehicle by its inspector the prior damages were not discovered[3], any damages sustained by plaintiffs were the result of Westfall's failure to inspect and discover the prior damage.[4] In other words, any damages sustained by plaintiffs due to alleged negligence on the part of GMAC's inspector were superseded by the intervening act of a failure to properly inspect occasioned by Westfall.

GMAC correctly argues that generally, a defendant who has contracted with another owes no duty to a plaintiff who is not a party to that agreement, and a non-party cannot sue for negligent performance of the contract. Owens v. Unified Investigations & Sciences, 166 S.W.3d 89, 92 (Mo.App. E.D. 2005). GMAC also correctly notes that this general rule of privity was designed to protect contractual parties from exposure to unlimited liability and to prevent burdening the parties with obligations they have not voluntarily assumed. Id.[5]

---

[3]It is undisputed that GMAC advertised the vehicle on its SmartAuction website as having "normal wear and tear." (GMAC SUMF: ¶ 16).

[4]Documents disclosed by plaintiffs reveal that Westfall claimed it inspected and certified the vehicle. (GMAC SUMF: ¶ 18).

[5]This had been the prevailing view. See, Ford Motor Co. v. Livesay, 160 P.901 (Okla. 1916). The court in Ford held that an automobile was not an inherently dangerous machine, and therefore, the rules of law applicable to dangerous instrumentalities did not apply. Id. In reliance on Winterbottom v. Wright, 10 M. & W. 109 (1842), the Ford court held that the general rule was that a manufacturer or vendor was not liable to third parties who had no contractual relations with him for negligence in the construction, manufacture, or sale of the articles he handled. Id., at 902.

As an illustration, the Ford court reasoned that "A manufacturer of automobiles, which

6

Plaintiffs, on the other hand, contend that the determination as to whether GMAC had a duty rests with whether it was foreseeable for GMAC to recognize that a failure to inspect the vehicle could result in damage to them.

While the proper inquiry is whether the defendant has assumed a duty of reasonable care to prevent foreseeable harm to the plaintiff; the existence and scope of the duty is determined by the contractual obligations the defendant undertook and the circumstances of the case. Owens, 166 S.W.3d at 92. The latter favors the argument proffered by GMAC that it expressly avoided liability as expressed in the disclaimers included in its agreement with Westfall. However, that does not end the inquiry, for it is generally stated that foreseeability that some injury might result from the act complained of normally serves as the paramount factor in determining the existence of a duty. Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc., 700 S.W.2d 426, 431 (Mo. 1985) (when deciding if some injury was reasonably foreseeable, whether expressly or implicitly, courts examine what the actor knew or should have known).

For instance, when a defendant undertakes to do something that the defendant knew or should have foreseen would harm others or increase the risk of harm to others, the defendant has a duty to exercise care in that undertaking. Owens, at 93. This is a reiteration of the well-recognized exception to the requirement of privity for situations where the negligence involves the safety of others. Id. Although it has been held that lack of privity is a barrier to liability, it has not been followed blindly and without exception. Westerhold v. Carroll, 419 S.W.2d 73, 77 (Mo. 1967) (when the application of the rule would produce a result contrary to the requirements of essential justice and sound public policy it has been whittled away by exceptions).[6] In Missouri

---

purchased the wheels used on its automobiles, was not liable to an injured person who purchased an automobile manufactured by it from a dealer and who had no contractual relations with it for its negligent failure to discover that one of the wheels was defective, since, while one who manufactures articles inherently dangerous is liable to third parties injured by such articles unless he exercises reasonable care, one who manufactures articles dangerous only if defectively made is not liable to third parties for injuries, except in case of willful injury or fraud." Id., at 903.

7

exceptions to the general rule have been written into the law allowing recovery for negligence in the absence of privity in cases where an act of negligence is imminently dangerous to the lives or safety of others or the thing dealt with is inherently dangerous. Id.[7]

The imminently dangerous product exception has been applied to motor vehicles, and recovery has been sought against the sellers of new and used vehicles. See, Am.L.Prod.Liab.3d § 13:22; citing, Gibbs v. General Motors Corp., 166 S.W.2d 575 (Mo. 1942). While recognizing exceptions to the general rule, it has been held that any extension of the limits of liability should be done on a case-by-case basis, with a careful definition of the limits of liability, depending on the differing conditions and circumstances to be found in individual cases. Westerhold, 419 S.W.2d at 78. GMAC, as a financing arm of General Motors Corporation, apparently also purchased and re-sold automobiles; similar to a car dealership. As such, the circumstances at bar permit an inference that as a dealer in automobiles, GMAC was familiar with the construction and operation of cars, and it's claim that it did not owe a duty to plaintiffs due to a lack of privity is not persuasive; at least in a personal injury case. This duty would undoubtedly require GMAC to inspect the cars it sold for proper operation, investigate the cause of any unusual condition apparent to it, and investigate the condition of parts which it might reasonably expect would need attention before being delivered to car dealers. Gibbs, at 579.[8]

It is essentially uncontroverted that when the vehicle sustained damage in the 2001 accident, State Farm Insurance paid for the repairs and GMAC did not receive notice of this transaction. (GMAC SUMF: ¶¶ 2-4).

---

[7]"A product is inherently dangerous where the danger of injury therefrom stems from the nature of the product itself, and not to any defect in the product." LaPlant v. E.I. DuPont De Nemours & Co., 346 S.W.2d 231, 238-39 (Mo.App. 1961); quoting, 74 A.L.R.2d 1111, 1146 (1960). A product is imminently dangerous "if, although it is not dangerous by its nature and is safe to be used for the purpose intended when properly constructed, it contains a defect which renders it dangerous when applied to its intended use in the usual and customary manner." LaPlant, at 239; quoting, 74 A.L.R.2d 1111, 1165 (1960).

[8]See also, Eversole v. Woods Acquisition, Inc., 135 S.W.3d 425, 429 (Mo.App. W.D. 2004) (unless evidence of control is attenuated by time or circumstance, superior knowledge can be inferred when a defendant exercises exclusive control over the instrumentality at issue).

8

When Mr. Williams terminated the lease and filled out the required Condition Report, he neglected to complete the section regarding whether the vehicle was in an accident, and he did not advise GMAC of this fact. (Id: ¶¶ 5-7). There is also no dispute that the CarFax report detailing the prior damage was not generated until October 28, 2002. Plaintiffs, however, argue that upon receipt of the Condition Report, GMAC should have questioned the less-than completed form. Further, it is undisputed that GMAC sells a significant number of cars to dealers through the SmartAuction website, and GMAC then finances these vehicles when the dealers sell the cars to retail buyers. (Plaintiffs' SUMF: ¶ 36). It is also undisputed that GMAC only requires the dealers to look for visible evidence of existing damage and visible evidence of poor prior repairs, does not require that the dealer look for over spray or inspect under the car. (Id: ¶¶ 41-42). In his affidavit, plaintiffs' expert witness, Richard Diklich, averred that upon performing an inspection similar to the one performed by used car dealers, he discovered the front end damage within ten minutes of his inspection. (Plaintiffs' Suggestions in Opposition: Ex. I, ¶ 3).

In sum, if an automobile dealer breaches his duty to inspect, then he is liable to the purchaser for personal injury resulting from such breach of duty. Gibbs, 166 S.W.2d at 439; see also, Bruner v. Gunderson, 102 F.2d 373 (8th Cir. 1939) (a dealer in used motor vehicles, who undertakes to recondition a vehicle taken in trade for resale, is not virtual insurer of safety thereof and need not disassemble the entire vehicle to examine each part before selling it, but must use reasonable care to ascertain whether it is equipped with the minimum essentials for safe operation).

Further, in order to prove a claim for negligence, a plaintiff must show that he sustained an injury. Manion v. Nagin, 394 F.3d 1062, 1067 (8th Cir. 2005) (proof of damages or a cognizable injury is essential to a negligence claim); see also, Guin v. Brazos Higher Education Service Corporation, Inc., 2006 WL 288483 *5 (D.Minn.) (a plaintiff must suffer some actual loss or damage in order to bring an action for negligence).

9

Case 4:05-cv-01042-GAF   Document 60   Filed 09/24/07   Page 9 of 16

In their complaint, plaintiffs asserted damages for, *inter alia*, the lost value of the vehicle, finance charges, taxes, insurance premiums, attorney's fees related to the investigation of the history of the vehicle, efforts to correct problems with the vehicle, and disruption of their work schedule and lost usage of the vehicle. (Complaint: ¶ 23). Plaintiffs also sought damages related to mental pain, emotional distress, and embarrassment. Id. However, they have presented no evidence, either by way of affidavit or deposition testimony, that they sustained actual damages or injury to person or property.

Mrs. Torp testified that she and her husband purchased the vehicle in December of 2001, and the total purchase price of the vehicle was $28,000, prior to the trade-in. (GMAC Supporting Suggestions: Ex. I, pg. 7, 12). In January of 2003, plaintiffs discovered, through a CarFax Report, that the vehicle sustained severe front end damage in June of 2001. (Id: pg. 19-28). Nevertheless, throughout that time, Mrs. Torp was able to drive the vehicle without incident, and with the exception of normal wear and tear, could not recall experiencing any problems with the vehicle. (Id: pg. 29). In fact, Mrs. Torp drove the vehicle until July of 2006, when she fell asleep at the wheel and drove into a concrete pillar. (Id: pg. 29-31). Mrs. Torp testified that there was no indication that prior damage to the vehicle contributed to her accident. (Id: pg. 33). Mrs. Torp admitted that prior to her accident, she and her husband entered into an agreement with Westfall O'Dell Motors in the amount of $47,500 in settlement of their fraud and negligence claims. (Id: pg. 33-35). In his affidavit, Mr. Diklich opined that due to the collision damage, the wholesale or retail sale value of the vehicle was decreased from the sale price of $28,900 to $24,500, a diminution in value of $4,500. (Plaintiffs' Suggestions in Opposition: Ex. I, ¶ 8). This "loss of value" is purely conceptual, in light of the destruction of the vehicle that was unrelated to unknown prior damage. But arguably the damage could be presented as an overpayment theory, when the vehicle was originally purchased.

That being the case, this modest damage claim constitutes economic loss.[9] Pursuant to the economic loss doctrine, a tort claim is prohibited where a plaintiff's claimed losses are purely economic; that is, where as here, there is no claim or evidence of damages relating to physical injury. Morris v. Novastar Mortgage, Inc., 2006 WL 2707349 *5 (W.D. Mo.); citing, R.W.Murray Co. v. Shatterproof Glass Corp., 697 F.2d 818, 828-29 (8th Cir. 1983). There are, however, two exceptions to the economic loss doctrine: (1) claims for fraud[10]; and (2) situations when a person having a special relationship possesses knowledge or skill superior to that of an ordinary person. Morris, at *5; citing, Murphy v. Northwest Mutual Insurance, Co., 2005 WL 1421789 *2-3 (W.D. Mo.). For the reasons stated herein, plaintiffs' claim for damages does not satisfy the fraud exception. The superior skill exception is generally confined to forms of professional malpractice. While that is not here involved, the negligence issue can be treated as part of the "limited group" protection discussed below.

C.      Fraud

To state a claim for fraud under Missouri law, a plaintiff must show: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or his ignorance of the truth; (5) the speaker's intent that it should be acted upon by the hearer in a manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's proximately caused injury. Morris, at *6.

---

[9] I acknowledge that even though plaintiffs paid more than the true value for the damaged car they also obtained a bonanza that would not have accrued to them if the car was undamaged. A trial judge other than myself will need to consider how this shakes out.

[10] In fraud cases, the courts of this state are committed to the benefit of the bargain rule as a method of arriving at damages. Morehouse v. Behlmann, 31 S.W.3d 55, 61 (Mo.App. E.D. 2000). Applied to a transaction involving the sale of an automobile, it allows the defrauded party to be awarded the difference between the actual value of the property and what its value would have been if it had been as represented. Id.

The undisputed facts are that the vehicle sustained front end damage while under a lease agreement with Brack Williams. (Suggestions in Support of Summary Judgment: pg. 2). Once GMAC reclaimed the vehicle it made it available to registered users, i.e. automobile dealers through the SmartAuction.(Id; see also; GMAC SUMF: ¶¶ 9-11). John Wohlfarth, project manager with GMAC, defined the SmartAuction website as a website that "features vehicles owned by GMAC....." (Id: Ex. A, ¶ 5). Katherine Beechuk testified that as a Quality Control agent with GMAC she reviewed Condition Reports received from lease turn-ins, and in the event the section for previous damage was not completed, if there was no record of receipt of an insurance check, she was instructed to represent the vehicle as one with "normal wear and tear;" and the prior customer would not be contacted about his failure to complete this section. (Id: Ex. E, pg. 18-19). This process was reiterated by GMAC employee, Tina Brown. (Id: Ex. F, pg. 17-19). Ultimately, GMAC represented on its website that the vehicle had only experienced normal wear and tear, and there was no mention of the prior front end damage. It is also undisputed that upon receipt of the vehicle, Westfall performed an inspection and certified the vehicle, but did not detect the prior damage. Wohlfarth testified, and GMAC does not dispute that based on the amount of the damage sustained, the vehicle would not have qualified for re-sale on the SmartAuction website. (Plaintiffs' Suggestions in Opposition: Ex. A: pg. 42-43). Thus, notice of this damage would constitute a material factor.

GMAC did not have express knowledge of the prior damage because payments made by the insurance company were sent directly to Mr. Williams, and notice of the damage was not placed on the CarFax database until well after plaintiffs purchased the vehicle. Nor did it have constructive knowledge sufficient to advance a fraud claim.

I recognize that it is possible to argue that GMAC "knew" that it was ignorant of the truth because the pertinent item in the form had not been completed by the seller. One would suppose, however, that when a member of the public fails to note previous damage, after being specifically asked, it may most reasonably be concluded that there has been no false concealment of damage. Omissions in responding to forms are notorious,

12

and must be dealt with in a practical manner. See, e.g., Williams v. Miller Pontiac Co., 409 S.W. 2d 275 (Mo.App. 1966) (buyer not barred from claiming fraud where he accepted a form with a blank as to "new car" or "used car.) The alternative, to take the precaution of trying to locate the signer and obtain a wholly completed form would be burdensome, and sometimes impossible. While a jury would be free to find a negligent omission by GMAC, I do not believe the bad guess in those circumstances can fairly be described as rising to the level of fraud. If plaintiffs have some authority for asserting the circumstances establish a submissible case of fraud, going beyond negligence, reconsideration may be possible.

For much the same reason, plaintiffs' claim for punitive damages is without merit. Punitive damages differ from compensatory damages in that compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct, while the well-established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct. Krysa v. Payne, 176 S.W.3d 150 (Mo.App. W.D. 2005).[11] As such, the amount of punitive damages should reflect the enormity of the defendant's offense and be related to actual or potential harm resulting therefrom. Id. Before awarding punitive damages in Missouri, a jury must find that the plaintiff has made a showing, by clear and convincing proof, either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences from which evil motive is inferred. Id, at 159; citing, Werremeyer v. K.C. Auto Salvage Co., 134 S.W.3d 633, 635 (Mo. Banc 2004). Plaintiffs have not provided clear and convincing proof sufficient for an award of punitive damages, and I also conclude there are no genuine issues of material fact regarding the fraud claim rendering summary judgment inappropriate.

D.  Negligent Misrepresentation

---

[11] The decision to punish a tortfeasor through an award of punitive damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment. Id.

13

To state a claim for negligent misrepresentation, a plaintiff must plead facts that establish: (1) that the speaker supplied information in the course of his business or some other pecuniary business; (2) that, due to the speaker's failure to exercise reasonable care of competence in obtaining or communicating information, the information was false; (3) that the speaker intentionally provided guidance for of a limited group of persons in a particular transaction; (4) that the listener justifiably relied on the information; and (5) that as a result of the listener's reliance on the information, he suffered a pecuniary loss. Morris, 2006 WL 2707349 at * 7. "A given representation can be an expression of opinion or a statement of fact depending upon the circumstances surrounding the representation." Grabinski v. Blue Springs Ford Sales, Inc., 136 F.3d 565, 569 (8th Cir. 1998).

GMAC contends that it made no representation to plaintiffs. Thus, there was no transaction between the parties, and plaintiffs' claim for negligent misrepresentation fails as a matter of law. In support of this contention GMAC relies on Ziglin v. Players MH, L.P., 36 S.W.3d 786 (Mo.App. E.D. 2001). In Ziglin, the plaintiff attempted to participate in a game of blackjack at the defendant Casino; however, upon suspicion of "counting cards" plaintiff was not permitted to play. Ziglin, at 788. The court found that plaintiff's claim of negligent misrepresentation failed as a matter of law because plaintiff failed to make a submissible case as to the third factor. Id., at 790. That is, due to plaintiff's exclusion from playing blackjack, no particular business transaction took place. Id.

In reliance on Chubb Group of Insurance Companies v. C.F.Murphy & Associates, Inc., 656 S.W.2d 766 (Mo.App. W.D. 1983), GMAC argues that its conduct demonstrates its lack of intent to influence plaintiffs. The court in Chubb considered a claim of negligent misrepresentation and found that such a cause of action should be considered within the narrow limitations of § 552 of the Restatement (Second) of Torts.[12] Under § 552, the

---

[12] Although a cause of action for negligent misrepresentation was not expressly recognized by the Supreme Court of Missouri, Judge Welliver in a dissenting opinion in Huttegger v. Davis, 599 S.W.2d 506 (Mo. 1980) (en banc), urged the court to consider the submissibility of a negligence theory by acknowledging that a cause of action existed for the recovery of pecuniary loss caused to persons who justifiably relied on information supplied for their guidance in a

14

duty is narrowly limited to "the person or one of a limited group of persons for whose benefit and guidance [the firm] intends to supply the information or knows that the recipient intends to supply it." Vogel v. Foth and Van Dyke Associates, Inc., 266 F.3d 838, 841 (8th Cir. 2001). Foreseeability is not the test; "[t]he plaintiff must have been a person for whose use the representation was intended, and it is not enough that the defendant ought reasonably to have foreseen reliance by someone such as the plaintiff." Vogel, at 841; quoting, Prosser and Keaton on the Law of Torts § 107, at 747 (1984).

GMAC's repeated argument that a lack of direct communication with plaintiffs somehow protects it from liability is unavailing. For strict privity of contract is not essential to a negligent misrepresentation claim when the defendant knows that a third party is relying on a particular business transaction. Ziglin, 36 S.W.3d at 790. Moreover, and in contrast to the circumstances in Vogel, here, there is a triable issue of fact as to whether plaintiffs were part of the limited group whom GMAC intended to influence with its statements regarding the vehicle. During his deposition, Wohlfarth testified that it is the primary intention of GMAC to provide accurate information to avoid the return of cars from dealerships; however, there was no real concern for the safety of the ultimate retail buyer. (Plaintiffs' Suggestions in Opposition: Ex. A, pg. 27-28). Wohlfarth then admitted, however, that GMAC was aware that the cars it sold on the website were subsequently sold by dealers as GM Certified used cars. (Id: pg. 69). Wohlfarth continued to testify that GMAC had no expectations that after purchasing cars on the SmartAuction website dealers then ultimately sold those cars to retail buyers; but, when pressed, Wohlfarth admitted his belief that dealers did not buy the cars "with the intention of keeping it forever,...." (Id: pg. 71-72). As to the vehicle in question, it would appear that GMAC had clear notice that Westfall dealership sold the vehicle to a retail buyer for it financed the purchase. (Id: pg. 72-73). In view of this evidence, summary judgment would be inappropriate for there are genuine issues of material fact as to whether

---

business transaction. Chubb, at 783.

plaintiffs are part of the limited group in a particular business transaction. Miller v. Big River Concrete, LLC, 14 S.W.3d 129, 133 (Mo.App. E.D. 2000).[13]

Accordingly, it is hereby

ORDERED that defendant's motion for summary judgment (ECF doc. 35) is DENIED in part and GRANTED in part. The claims for fraud and punitive damages are disallowed.

    /s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

September 24, 2007

Kansas City, Missouri

---

[13] I recognize that this approach is subject to further question as using the inappropriate foreseeability theory. More pertinent cases may be dispositive.